UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| MATTHEW S. SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-CV-118-SPM |
| | ) | |
| DEAN FINCH, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on the Motion for Summary Judgment filed by Defendant Darren Garrison and Laura Yount (Doc. 94) and the Motion for Partial Summary Judgment filed by Defendants Dean Finch and Stacy Sikes (Doc. 91). The motions have been fully briefed. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636. (Doc. 73). For the reasons stated below, the motions will be granted as to Plaintiff's federal claims, and the Court will decline to exercise jurisdiction over Plaintiff's state law claims and will dismiss them without prejudice.

## I.     FACTUAL BACKGROUND

This case arises out of the wrongful arrest and overnight detention of Plaintiff Matthew S. Smith on October 30, 2015. Plaintiff was arrested pursuant to an arrest warrant erroneously issued by the Wayne County Circuit Clerk's Office for Plaintiff instead of for another individual with the same name. At all times relevant to this action, Defendant Darren Garrison was the Circuit Clerk of Wayne County, Missouri (Finch and Sikes' Statement of Material Uncontested Facts ("Finch SOF"), Doc. 93, ¶ 4); Defendant Laura Yount was an assistant circuit court clerk in Wayne County, Missouri (Garrison and Yount's Statement of Uncontroverted Material Facts ("Garrison SOF"),

Doc. 96, ¶ 10); Defendant Dean Finch was the Sheriff of Wayne County, Missouri (*id.* ¶ 2); and Defendant Stacy Sikes was a dispatcher at the Wayne County Sheriff's Department (Finch SOF, Doc. 93, ¶ 3).

### A.  The Underlying Offense

Sometime before October 23, 2015, an individual named Matthew S. Smith (the "1985 Matthew Smith") was criminally charged with possession of a controlled substance and was released on bond. (Garrison SOF, Doc. 96, ¶ 7.)  On October 23, 2015, the prosecuting attorney for Wayne County, Missouri filed a Motion to Revoke Bond, based on the assertion that the 1985 Matthew Smith had failed to comply with his bond conditions. (*Id.* ¶ 8). In response to that request, Circuit Court Judge Randy Paul Schuller directed the Circuit Clerk's Office to issue a warrant for the arrest of the 1985 Matthew S. Smith. (*Id.* ¶ 9, 11).

According to the Probable Cause Statement and Felony Complaint, the 1985 Matthew Smith has a birth date of August 15, 1985, a social security number ending in 1832, and an address on Fairview Way in Perryville, Missouri. (Plaintiff's Statement of Additional Uncontroverted Material Facts in Response to Defendant Garrison's and Yount's Motion for Summary Judgment ("Pl. SOF—Garrison"), Doc. 104, ¶ 98). Although Plaintiff is also named Matthew S. Smith, his date of birth is October 6, 1961, and, at the time, he resided in St. Charles County, Missouri. (*Id.* ¶¶ 99-100). Plaintiff's driver's license number and social security number were, naturally, also different from those of the 1985 Matthew Smith. (*Id.* ¶ 99).

### B.  Wayne County Warrant Procedure

During the relevant timeframe, the procedure by which the Wayne County Circuit Clerk's Office issued warrants was as follows: the prosecuting attorney would take the probable cause statement and/or felony complaint to the judge; the judge would decide that a warrant should issue;

and the judge's request for a warrant to issue would be put in a basket for one of the clerks to issue a warrant. (*Id.* ¶ 21; Deposition of Laura A. Yount, Dec. 11, 2017 ("Yount Dep.") 15:5-8, 19:8-20:8). A clerk would then prepare the warrant electronically using the Circuit Court's computer database and the probable cause statement. (Pl. SOF—Garrison, Doc. 104, ¶¶ 21-23). It was the policy of the Clerk's Office that the clerk issuing the warrant would compare the information in the warrant with the information in the probable cause statement to make sure they matched; the prosecutor and judge did not check the warrant for accuracy. (*Id.* ¶¶ 28-29; Finch SOF, Doc. 93, ¶ 52; Yount Dep. 51:13-17).

Once the clerk prepares the warrant, it is taken across the parking lot from the Clerk's Office to the Sheriff's Department. (Finch SOF, Doc. 93, ¶ 15). When the Clerk's Office brings an arrest warrant to the Sheriff's Department, the warrant is not accompanied by the probable cause statement or other information about the person named in the warrant. (*Id.*). The Sheriff's Department is not provided with a photograph of the defendant. (*Id.* ¶ 17). The person on duty in dispatch receives the warrant, initials it, and dates it. (Deposition of Stacy Sikes, Feb. 21, 2018 ("Sikes Dep.") 20:15-21:1). The initials indicate only that it was received, not that it was reviewed by anyone at that time. (*Id.* 28:4-16). If the dispatchers are not busy, they enter the warrant into the MULES[1] system immediately; otherwise, the warrant is placed in a basket and entered later, within a three-day time frame. (*Id.* 21:2-21).

The procedure for entering an arrest warrant into MULES requires the dispatcher to use identifying information from the warrant to run a search of Department of Revenue ("DOR") records, which pulls up a driving record and driver's photograph of the individual on the arrest

---

[1] The MULES system is the Missouri Highway Patrol system for warrants for arrest; felony warrant information entered into MULES is available nationwide. (Pl. SOF—Finch, Doc. 101, ¶ 42).

warrant. (Finch SOF, Doc. 93, ¶ 10; Plaintiff's Statement of Additional Uncontroverted Material Facts in Response to Defendant Finch's and Sikes' Motion for Partial Summary Judgment ("Pl. SOF—Finch"), Doc. 101, ¶ 8). The Sheriff's Department can get other information from the DOR records, such as the social security number, operator driver's license number, address, and height/weight, and they can then enter the DOR information into the MULES entry form. (Pl. SOF—Finch, Doc. 101, ¶¶ 8, 15, 51). If the information from the DOR records is inconsistent with information in the warrant, or if the searches pull up a mixture of two people's information, the Sheriff's Department will typically contact the Clerk's Office and let them know there is an issue. (Finch SOF, Doc. 93, ¶ 16. Pl. SOF—Finch, Doc. 101, ¶ 3). The Sheriff's Department does not usually use a person's address as an identifier, because people move around, and an address discrepancy would not have led a dispatcher to get more verification. (Deposition of Clalyn Leach, May 30, 2017 ("Leach Dep.") 79:1-18; Sikes Dep. 18:5-10). It is not the policy of the Sheriff's Department to verify that that the information the dispatcher enters into MULES from the warrant or from DOR records is the same as the information on the probable cause statement. (Pl. SOF—Finch, Doc. 101, ¶ 8).

If someone from the Clerk's Office brings over a new warrant and tells a dispatcher at the Sheriff's Department that the warrant is to replace a warrant that was previously delivered, then the Sheriff's Department will cancel the first warrant and any associated MULES entries. (*Id.* ¶ 10; Sikes Dep. 21:22-22:21; 32:6-18; 35:10-19). If, however, the dispatcher receives a new warrant without being told that it is to replace an old warrant, the dispatcher will go to enter the new warrant into MULES. If the dispatcher goes to enter the new warrant and sees that there is already a warrant for the same person, she will call the Circuit Clerk for verification. However, if the two warrants

do not appear to involve the same person, the dispatcher will go ahead and enter the new warrant. (Sikes Dep. 35:20-36:6).

### C. The Mistaken Warrant

On October 23, 2015, Defendant Yount set out to prepare a warrant for the arrest of the 1985 Matthew S. Smith pursuant to the above procedures, as directed by Judge Schuller. (Garrison SOF, Doc. 96, ¶ 11). In preparing the warrant, Defendant Yount logged into the 42nd Judicial Circuit's database on her office computer and searched the database for "Matthew Smith," and a drop-down menu showed up that contained nine "Matthew Smiths" in the database. (*Id.* ¶¶ 13-15). Defendant Yount then made a mistake: instead of clicking on the "Matthew S. Smith" that corresponded to the 1985 Matthew Smith, she clicked on the "Matthew S. Smith" that corresponded to Plaintiff. (*Id.* ¶¶ 16-18). Once Yount clicked on Plaintiff's name, the 42nd Judicial Circuit's computer system automatically populated a warrant form that contained Plaintiff's information instead of the information of the 1985 Smith (the "Mistaken Warrant"). (*Id.* ¶¶ 14, 19). Yount testified that she may have violated the policy requiring her to compare the warrant and the probable cause statement. (Finch SOF, Doc. 93, ¶ 53). Once the Mistaken Warrant was generated, Judge Schuller's signature and Garrison's signature were placed on the Mistaken Warrant with ink stamps. (Garrison SOF, Doc. 96, ¶ 12; Pl SOF—Garrison, Doc. 104, ¶ 27). On October 23, 2015, the Mistaken Warrant was taken to the Wayne County Sheriff's Department to be processed. (Finch SOF, Doc. 93, ¶ 37).

The Mistaken Warrant has a received stamp on it, the initials "SS," and the date October 23, 2015, indicating that Sikes received it on behalf of the Sheriff's Department on that date. (Pl. SOF—Finch, Doc. 101, ¶ 7; Mistaken Warrant, Doc. 104-13). On October 24, 2015, the day after

it was received, a dispatcher in the Sheriff's Department entered the information from the Mistaken Warrant into the MULES system. (Finch SOF, Doc. 93, ¶ 38).[2]

At some point after the Mistaken Warrant was taken to the Sheriff's Department, the error in the Mistaken Warrant was discovered by someone in the Clerk's Office, and various corrected or partially corrected versions of the warrant were generated. (Doc. 104-9, Doc. 104-12, Doc. 104-14, & Doc. 104-15). However, it is unclear who discovered the mistake, when and how the mistake was discovered, when the corrected versions of the warrants were created, and what was done with those corrected versions of the warrant. The witnesses have little memory of the relevant events, and the documents in the record provide little clarity. One version of the "corrected warrant" suggests that the error was discovered the same day the Mistaken Warrant was issued, and the corrected warrant was delivered to the Sheriff's Department the same day. However, there is also evidence of record suggesting the mistake was not discovered until after Plaintiff was arrested. Assuming that one or more versions of a corrected warrant were delivered to the Sheriff's Department *before* Plaintiff's arrest, there is no evidence of record that anyone from the Clerk's Office ever told anyone in the Sheriff's Department that any of the corrected warrants were intended to replace the Mistaken Warrant, that the Mistaken Warrant had been based on an error, or that the Mistaken Warrant needed to be cancelled.

### D. Plaintiff's Arrest on October 30, 2015

On October 30, 2015, Plaintiff was returning from China through O'Hare International Airport in Chicago, Illinois, and he was detained by customs agents. (Finch SOF, Doc. 93, ¶¶ 39-41). That day at 2:44 p.m., the Wayne County Sheriff's Department received a "hit" from the Chicago Police Department (the "Chicago PD"), indicating that a "Matthew S. Smith" with

---

[2] It is unknown which dispatcher entered this information into MULES. (Sikes Dep. 37:8-22).

Plaintiff's birth date had been detained, asking if the warrant was valid, asking the amount of the bond, and stating, "Please fax prints and warrant copy ASAP for court prep." (*Id.* ¶ 42; Exhibit 8 to Sikes Dep., Doc. 93-3, at 23-24). When a hit comes in from a law enforcement agency, the normal procedure in the Sheriff's Department is that the dispatcher pulls the file containing paper copies of the warrant and the prior printouts from the Sheriff's Department from the filing cabinet, then compares the date of birth and social security number in the hit with the information in the warrant packet. (*Id.* ¶ 18; Sikes Dep. 24:12-23; Leach Dep. 26:17-25). In a typical hit, the Sheriff's Department is not questioning whether the person being detained is the right person. (Leach Dep. 41:11-15).

When Sikes received the "hit" from the Chicago PD on October 30, she followed the above procedure of pulling the paper warrant file and comparing the information in the file to the information in the hit. (Finch SOF, Doc. 93, ¶ 18, Pl.'s Resp. to Finch SOF, Doc. 100, ¶ 18; Sikes Dep. 45:18-46:1). Sikes did not call the Clerk's Office to ask if the warrant was valid, nor did she check with anyone or bring the picture up from DOR records; all she did was check the paperwork. (Pl. SOF—Finch, Doc. 101, ¶¶ 43, 45). Sikes testified that neither the hit nor the request for fingerprints alerted her that the Chicago PD had any questions about whether they had the correct Matthew Smith. (Sikes Dep. 47:13-20). Sikes responded to the Chicago PD that the warrant was active, they would extradite, and no bond should be granted. (Finch SOF, Doc. 93, ¶ 43). At 4:50 p.m. and again at 6:01 p.m., Sikes faxed a copy of the Mistaken Warrant to the Chicago PD. (*Id.* ¶ 45). Sikes did not send fingerprints, as it was not the policy of the department to do so. (Pl. SOF—Finch, Doc. 101, ¶ 50).

On October 31, 2015, one of Plaintiff's attorneys contacted the Sheriff's Department and had conversations with an unknown woman there. (Deposition of Plaintiff Matthew S. Smith, May

22, 2018, 28:4-23). As a result of those conversations, Ms. Tarna Peach, a dispatcher in the Sheriff's Department, determined that the warrant had been improperly issued. (Finch SOF, Doc. 93, ¶ 49; Leach Dep. 33:20-35:16). At 9:41 a.m., Peach notified Chicago PD that the wrong Matthew Smith had been detained, that the court had entered the wrong information in the warrant, and that the Chicago PD should release Plaintiff. (Finch SOF, Doc. 93, ¶ 48). Plaintiff was released from the custody of the Chicago PD on the afternoon of October 31, 2015. (*Id.* ¶ 47).

In his Second Amended Complaint, Plaintiff asserts eight claims: (I) violation of 42 U.S.C. § 1983 against Defendants Finch and Sikes; (II) violation of the Missouri Sunshine Law, Mo. Rev. Stat. § 610.010 *et seq.*, against Defendant Finch; (III) negligence against Defendants Finch and Sikes; (IV) false imprisonment against Defendants Finch and Sikes; (V) violation of § 1983 against Defendants Garrison and Yount; (VI) negligence against Defendants Garrison and Yount; (VII) false imprisonment against Defendants Garrison and Yount; and (VIII) ultra vires acts against Garrison and Yount.

Defendants Garrison and Yount (the "Clerk's Office Defendants") have filed a motion for summary judgment in which they seek judgment on all four claims against them: Counts V, VI, VII, and VIII. Defendant Finch and Sikes (the "Sheriff's Department Defendants") have filed a motion for partial summary judgment in which they seek summary judgment on three of the claims against them: Counts I, III, and IV.

## II. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See also Hill v. Walker*, 737 F.3d 1209, 1216 (8th Cir. 2013). The movant "bears the initial responsibility of informing the district court of the basis for its motion" and must identify "those

portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out "specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quotation marks omitted). "On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007) (internal quotation marks omitted)).

## III. DISCUSSION

The Court will begin with Defendants' motions for summary judgment as they relate to Plaintiff's federal claims under 42 U.S.C. § 1983.

### A. Plaintiff's Claims Under 42 U.S.C. § 1983 (Counts I and V)

#### 1. Count V: The § 1983 Claim Against the Clerk's Office Defendants

In Count V, Plaintiff alleges that Defendant Yount's and Defendant Garrison's actions in issuing the warrant for his arrest, and/or in failing to proof or review the warrant for his arrest, violated his constitutional rights under 42 U.S.C. § 1983.[3] In their motion for summary judgment, Defendants Garrison and Yount make three arguments: (1) that they are entitled to summary judgment because their actions were not the proximate cause of Plaintiff's arrest; (2) that they are entitled to summary judgment because they are entitled to absolute quasi-judicial immunity; and (3) that they are entitled to summary judgment based on qualified immunity.[4]

---

[3]To the extent that Plaintiff asserts any claim against Defendant Garrison based on a failure to train or supervise his employees, the Court has already dismissed that claim. (Doc. 89).

[4] Defendants Garrison and Yount do not renew the argument they made at the motion to dismiss stage that Plaintiff's claims fail because Defendants' conduct was, at most, negligent, and thus not actionable under § 1983. *See Young v. City of Little Rock*, 249 F.3d 730, 734 (8th Cir. 2001) (affirming dismissal of § 1983 claim against dispatcher whose mistake "amounted to nothing more than negligence, which normally does not give rise to a claim under § 1983"). Thus, the Court does

The Court begins with the Clerk's Office Defendants' argument that they are entitled to summary judgment on all of Plaintiff's claims under § 1983 because they are entitled to absolute quasi-judicial immunity. In its prior ruling on Defendants Yount and Garrison's motion to dismiss, the Court found unpersuasive Defendants' argument that they were entitled to absolute quasi-judicial immunity on the ground that court clerks are shielded from liability under § 1983 whenever they perform tasks that are an integral part of the judicial process, unless they act in the clear absence of all jurisdiction, and because the issuing and processing of warrants is an integral part of the judicial process. The Court acknowledged that the Eighth Circuit had previously held that a court clerk was "entitled to absolute immunity for signing and issuing [an] arrest warrant regardless of whether [the judge] instructed her to do so because these acts are integral parts of the criminal judicial process." *Boyer v. County of Washington*, 971 F.2d 100, 102 (8th Cir. 1992). However, after reviewing the Supreme Court's decision in *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429 (1993), as well as the Eighth Circuit cases decided after *Antoine* addressing immunity for court clerks and others, the Court found that under current law, court clerks are not necessarily absolutely immune from liability merely because they are performing tasks that may be considered an integral part of the judicial process. *See Smith v. Finch*, 324 F. Supp. 3d 1012, 1022-24 (E.D. Mo. 2018). Instead, the Court found that the governing law was provided by the Eighth Circuit's more recent statement that "Clerks are absolutely immune only for acts that may be seen as discretionary, or for acts taken at the direction of a judge or according to court rule." *Geitz v. Overall,* 62 F. App'x 744 (8th Cir. 2003) (citing *Antoine*, 508 U.S. at 436; *Martin v. Hendren*, 127 F.3d 720, 721 (8th Cir. 1997); and *Robinson v. Freeze*, 15 F.3d 107, 108-09 (8th Cir. 1994)). The

---

not address the issue of whether there is a genuine dispute as to whether Defendants' conduct constitutes more than negligence.

Court found that the Clerk's Office Defendants were not entitled to absolute quasi-judicial immunity at the motion to dismiss stage, because the allegations in the Second Amended Complaint did not show that their actions were discretionary, were taken at the direction of a judge, or were taken according to a court rule.

The Clerk's Office Defendants now argue that they are entitled to absolute quasi-judicial immunity because the uncontroverted facts show that their actions in issuing the warrant at issue were taken at the direction of the judge, as part of the judicial function of issuing an arrest warrant.[5] After review of the evidence and briefing submitted by the parties, the Court agrees. The Court first notes that it is clear that if the judge himself had made the error at issue here, he would be protected from suit by judicial immunity, because the issuing of an arrest warrant is a judicial

---

[5] In the alternative, the Clerk's Office Defendants also suggest that the Court should reconsider its prior ruling and find that *Boyer* is still applicable and provides court clerks with absolute immunity from liability for their acts related to the issuance of warrants. To support that position, they cite several district court cases that have (without discussing *Antoine* or *Geitz*) continued to apply *Boyer* to situations involving the issuance of warrants. They also offer new arguments in an attempt to distinguish *Antoine,* though they do not attempt to distinguish the post-*Antoine* Eighth Circuit cases on which the Court relied in its prior ruling.

The Court acknowledges that it is certainly possible that the Eighth Circuit, if directly confronted with the issue, would conclude that *Boyer*'s holding (that court clerks are entitled to absolute immunity for signing and issuing arrest warrants regardless of whether a judge instructed them to do so because "these acts are integral parts of the criminal judicial process," 971 F.2d at 102), remains in force, in whole or in part, even after *Antoine*. However, for several reasons, this Court cannot so conclude at this time. First, the reasoning used by the Eighth Circuit in *Boyer* was nearly identical to the reasoning the Supreme Court rejected in *Antoine* (that a court reporter was entitled to immunity because the court reporter's duties were "functionally part and parcel of the judicial process," 508 U.S. at 432). Second, in *Robinson v. Freeze*, 15 F.3d 107, 108 (8th Cir. 1994), the Eighth Circuit applied *Antoine* to assess the scope of quasi-judicial immunity applicable to bailiffs, rejecting the "integral part of the judicial process" test that had been used by the district court before *Antoine* was decided. Third, it does not appear that the Eighth Circuit has applied *Boyer* in any cases since *Antoine*, either to court clerks or other officials. However, the Eighth Circuit has applied the *Antoine* standard in multiple cases involving claims against court clerks. *See Maness v. Dist. Court of Logan Cty.*, 495 F.3d 943 (8th Cir. 2007); *Geitz v. Overall,* 62 F. App'x 744 (8th Cir. 2003); *McCullough v. Horton*, 69 F.3d 918 (8th Cir. 1995). For these reasons, this Court finds itself bound to apply the standard articulated in *Antoine* and the post-*Antoine* Eighth Circuit case law.

function. *See Denoyer v. Dobberpul*, 208 F.3d 217 (8th Cir. 2000) (claim against a judge for issuing an arrest warrant was barred by judicial immunity); *Duty v. City of Springdale*, 42 F.3d 460, 462 (8th Cir. 1994) (judge was acting in his judicial capacity when issuing an arrest warrant and thus was entitled to absolute judicial immunity). *Cf. Robinson v. Freeze*, 15 F.3d 107, 108 (8th Cir. 1994) ("Judges performing judicial functions enjoy absolute immunity from § 1983 liability."); *Schottel v. Young*, 687 F.3d 370, 373 (8th Cir. 2012) ("An act is a judicial act if it is one normally performed by a judge and if the complaining party is dealing with the judge in his judicial capacity.") (internal quotation marks omitted).

The uncontroverted evidence shows that in issuing and signing the warrant at issue in this case, Yount and Garrison were performing a judicial function, and were doing so "at the direction of a judge." *See Geitz*, 62 F. App'x 744. Yount prepared an arrest warrant for a Matthew S. Smith because the judge told her to do so, using the procedures under which the judge tells clerks to issue warrants. Based on the uncontroverted facts here, in issuing the warrant, and in taking any subsequent action to correct their error, Defendants Garrison and Yount were simply attempting to carry out a judge's direction to assist the judge in performing the judicial act of issuing a warrant. Although the precise contours of the judicial immunity doctrine are far from clear, the Court finds that they encompass such a situation. The fact that Ms. Yount made a mistake in carrying out this direction and then the Clerk's Office, apparently ineptly, tried to correct the mistake, does not remove the protections of absolute quasi-judicial immunity. The Eighth Circuit has found that an individual who makes a mistake or acts improperly in carrying out a judge's order does not lose the protections of quasi-judicial immunity, noting that "[a]bsolute quasi-judicial immunity would afford only illusory protection if it were lost the moment an officer acted improperly." *Martin v. Hendren*, 127 F.3d 720, 722 (8th Cir. 1997) (holding that an officer carrying out a judge's order

to remove a witness from the courtroom was entitled to absolute quasi-judicial immunity because he was obeying a judicial order that was "related to the judicial function"; finding that the officer did not lose the protections of absolute quasi-judicial immunity when he used excessive force in carrying out the order). *See also Payne v. Saint Louis, Missouri, City of St. Louis*, No. 4:17-CV-01769-AGF, 2018 WL 583043, at *6 (E.D. Mo. Jan. 29, 2018) ("A 'mistake' does not take away quasi-judicial immunity, 'even if it results in grave procedural errors.'"); *Wann v. St. Francois Cty., Missouri*, No. 4:15CV895 CDP, 2016 WL 866089, at *9 (E.D. Mo. Mar. 7, 2016) (rejecting the argument that a non-judicial officer was not entitled to quasi-judicial immunity because the officer acted unlawfully in carrying out judicial decisions; stating that the judicial immunity inquiry "is controlled by the nature of the function being performed, not the particular act itself" and that "[a]bsolute quasi-judicial immunity would afford only illusory protection if it were lost the moment an officer acted improperly").[6]

For all of the above reasons, the Court finds that the Clerk's Office Defendants are entitled to absolute quasi-judicial immunity on the § 1983 claims against them. Thus, the Clerk's Office Defendants' motion will be granted as to Count V.

## 2. *Count I: The § 1983 Claim Against the Sheriff's Department Defendants*

In Count I, Plaintiff alleges that Defendant Finch and Defendant Sikes violated his constitutional rights under 42 U.S.C. § 1983 in their handling of the Mistaken Warrant and any corrected versions of the warrant, in their handling of the inquiry from the Chicago PD regarding

---

[6] The Court acknowledges that the facts suggest the possibility that Clerk's Office Defendants' actions were unreasonable, particularly with regard to their failure to adequately alert the Sheriff's Department to the mistake after it was discovered. If the Court were to reach the question of qualified immunity for the Clerk's Office Defendants, it would have to consider the reasonableness of their actions. However, in the absolute quasi-judicial immunity analysis, the Court does not consider the reasonableness of the Defendants' actions, but only whether the Defendants were performing a judicial function or acting at the direction of a judge.

the validity of the Mistaken Warrant, and in the failure to institute appropriate policies and procedures related to warrants. Defendants seek summary judgment on Count I in its entirety, arguing that Defendants Finch and Sikes are both entitled to qualified immunity, that Finch was not personally involved in the events at issue, that there have been no allegations of any unconstitutional policies of the Sheriff's Department, and that there have been no allegations of any deficiencies in Defendant Finch's training or supervision of his employees. Count I encompasses several potential claims, which the Court will consider separately

*a.  § 1983 Claim Against Sikes*

The Court first considers Plaintiff's claim that Sikes violated his constitutional right to be free from unlawful arrest and detention. First, Plaintiff alleges that Sikes violated his rights because upon receiving a corrected version of the warrant, she failed to take action to shred or return the Mistaken Warrant (and cancel any associated MULES entries). Second, Plaintiff contends that Sikes violated his constitutional rights when, upon receiving the "hit" from the Chicago Police Department and the inquiry from Plaintiff's attorney, she simply consulted the warrant file containing the Mistaken Warrant and forwarded it to the Chicago Police Department, without conducting any additional investigation into whether the warrant had been correctly issued and without providing any additional information that could have shown his innocence (such as fingerprints).

Sikes argues that she is entitled to qualified immunity. "'Qualified immunity shields government officials from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known.'" *De Boise v. Taser Int'l, Inc.,* 760 F.3d 892, 896 (8th Cir. 2014) (quoting *Brown v. City of Golden Valley*, 574 F.3d 491, 495 (8th Cir. 2009)). A government official is entitled to qualified immunity

unless "(1) the facts alleged or shown, construed in the light most favorable to [the plaintiff], establish a violation of a constitutional or statutory right, *and* (2) the right was clearly established as of [the date of the alleged violation], such that a reasonable official would have known that his actions were unlawful." *Edwards v. Byrd*, 750 F.3d 728, 731-32 (8th Cir. 2014) (internal quotation marks omitted). "A right is clearly established when the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Winslow v. Smith*, 696 F.3d 716, 738 (8th Cir. 2012) (internal quotation marks and citation omitted). In order for a right to be clearly established, there need not be "a case directly on point"; however, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "The determination of whether an officer is entitled to qualified immunity requires consideration of the 'objective legal reasonableness' of the officer's conduct in light of the information he possessed at the time of the alleged violation." *Hoyland v. McMenomy*, 869 F.3d 644, 652 (8th Cir. 2017) (quoting *Winters v. Adams*, 254 F.3d 748, 766 (8th Cir. 2001)).

The doctrine of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The doctrine "'gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law.'" *Mendoza v. United States Immigration and Customs Enforcement*, 849 F.3d 408, 416 (8th Cir. 2017) (quoting *Blazek v. City of Iowa City*, 761 F.3d 920, 922 (8th Cir. 2014)).

In the wrongful arrest and detention context, both the Fourth Amendment right not to be arrested without probable cause and the Fourteenth Amendment protection against deprivations of

liberty without due process of law may be implicated. In their briefing, the parties do not clearly distinguish between wrongful arrest cases that involve Fourth Amendment violations and wrongful detention cases that involve due process violations under the Fourteenth Amendment, and it is not entirely clear what type of claim Plaintiff is attempting to assert. Defendants cite primarily (but not exclusively) Fourteenth Amendment cases, and Plaintiff responds by citing primarily (but not exclusively) Fourth Amendment cases. Generally, courts analyze challenges to an arrest itself under the Fourth Amendment's probable cause requirement, but analyze challenges to continued wrongful detention after arrest under the Fourteenth Amendment's due process requirement. *See Luckes v. Cty. of Hennepin, Minn.*, 415 F.3d 936, 939 (8th Cir. 2005) (finding that because probable cause was established by the existence of a valid bench warrant, plaintiff's Fourth Amendment argument was without merit, and his claim that his detention violated his constitutional rights was "more properly analyzed under the framework of the Due Process Clause of the Fourteenth Amendment"); *Baker v. McCollan*, 443 U.S. 137, 143-46 (1979) (discussing the Fourth Amendment's probable cause requirement in a mistaken arrest and detention case but noting that because the plaintiff's § 1983 claim was not based on the wrong name being placed in the warrant or the initial arrest, but rather the officers' post-arrest failure to investigate the plaintiff's innocence, the claim would be analyzed under the due process clause).

The Court first considers Sikes' potential liability under the Fourth Amendment for her role in causing Plaintiff's arrest based on the Mistaken Warrant. The Eighth Circuit has found that "[a] arrest executed pursuant to a facially valid warrant generally does not give rise to a cause of action under 42 U.S.C. § 1983 against the arresting officer." *Fair v. Fulbright*, 844 F.2d 567, 569

(8th Cir. 1988).[7] Based on this principle, officers effecting arrests based on valid warrants have been found to be entitled to qualified immunity on § 1983 claims. For example, in *Heard v. City of Blytheville, Ark.*, No. 3:10CV272 SWW, 2011 WL 1639231, at *2 (E.D. Ark. May 2, 2011), the plaintiff brought a § 1983 claim alleging that police officers had illegally arrested her because the warrant on which her arrest was based was invalid. *Id.* at *2. Citing *Fair*, the court stated that "an arrest executed pursuant to a facially valid warrant generally does not give rise to a cause of action under 42 U.S.C. § 1983," and it dismissed the claim because there was no allegation that the warrant was *facially* invalid. *Id. See also Hunt v. Smith*, No. 2:03CV00194-WRW, 2008 WL 491678, at *5 (E.D. Ark. Feb. 19, 2008) ("Even if Defendant Wilson violated Plaintiff's constitutional rights, he is entitled to qualified immunity because a reasonable officer in Defendant's position would not have known that arresting a person based on a facially valid warrant is a constitutional violation.").

Additionally, even in cases where no facially valid arrest warrant existed at all, the Eighth Circuit has found that officers who reasonably rely on evidence that a valid warrant exists are entitled to qualified immunity where their actions were otherwise objectively reasonable under the circumstances. *See Young v. City of Little Rock*, 249 F.3d 730, 734-35 (8th Cir. 2001) (affirming dismissal of § 1983 claims based on the Fourth Amendment against an arresting officer and a dispatcher where the arresting officer's car computer showed a warrant and the dispatcher mistakenly verified that a warrant existed; finding that the officer had an objectively reasonable basis for making the arrest and finding that the dispatcher's mistake amounted to "nothing more

---

[7] Plaintiff's position is that it "makes no difference" that Finch and Sikes were not the arresting officers, and that "an official's liability for causing an arrest is the same as for carrying it out." Pl.'s Mem. Opp'n Mot. Summ. J. of Finch and Sikes, Doc. 99, at 15. Defendants do not appear to dispute this contention.

than negligence, which normally does not give rise to a claim under § 1983"); *Edwards v. Baer*, 863 F.2d 606, 608 (8th Cir. 1988) (officer who arrested plaintiff based on computer information that incorrectly showed that a warrant was still outstanding was entitled to qualified immunity where "[b]ased upon an objective appraisal of the facts we find that a reasonable and competent police officer could have believed that a warrant existed and that he had legal authority to make an arrest based on that warrant").

In contrast, the Fourth Amendment cases cited by Plaintiff involve officers who did *not* reasonably rely on facially valid warrants or other reliable information indicating the existence of a warrant. In *Milligan v. United States*, No. 3:07-1053, 2008 WL 1994823 (M.D. Tenn. May 2, 2008), officers made an arrest after consulting a spreadsheet erroneously naming the plaintiff as an individual for whom four outstanding warrants existed. *Id.* at *1. The court denied the officers' claim of qualified immunity, stating that "[i]n order for an officer to reasonably rely on a facially valid warrant, that warrant—and not merely a spreadsheet including some of the information on the warrant—must actually be consulted." *Id.* at *6. The court also found that even if the officers had consulted the warrants, there was a factual dispute about what identifying information the warrants contained and whether (in light of the information in the warrants) it would have been reasonable for the officers to rely on those warrants to believe that the plaintiff was the actual subject of the warrants. *Id.* at *6. Similarly, in *Harris v. Zyskowski*, No. 12-7191(NLH), 2013 WL 6669186 (D. N.J. Dec. 18, 2013), the arresting officer did not rely on a warrant, but instead relied on information in a database suggesting the possible existence of a warrant. *Id.* at *1. The court found that because the complaint alleged that the arresting officer was in possession of conflicting information regarding the existence of the warrant from two different law enforcement databases, because the plaintiff had explained to the officer that the charges had been dropped, and because

the court had no information regarding the reliability of the databases or the ability of the officer to confirm the existence of the warrant, it could not hold as a matter of law that the officer's behavior was reasonable under the circumstances. *Id.* at *5-*6.

Based on the above law and the undisputed facts in this case, the Court finds that Sikes is entitled to qualified immunity on Plaintiff's claim that she violated his Fourth Amendment rights when, relying on the Mistaken Warrant in the file cabinet, she reported to the Chicago PD that there was a valid warrant for Plaintiff without conducting additional investigation or sending additional information. Like the officers in the cases finding no § 1983 liability, and unlike the officers in the cases cited by Plaintiff, Sikes' actions were taken only after she consulted a facially valid arrest warrant for Plaintiff, issued by the Court and bearing the signature of a judge. There is no evidence that Sikes was actually alerted to any mistaken identity issue on October 30, 2015. However, even assuming, *arguendo*, that there was evidence from which a jury could find that Sikes had been alerted to the fact that Plaintiff was claiming to be the wrong "Matthew S. Smith," the Court does not find that she would have understood that the constitution required her to investigate those claims. As the Supreme Court stated in *dicta* in *Baker v. McCollan*, 443 U.S. 137, 145 (1979), "[t]he constitution does not guarantee that only the guilty will be arrested," and "we do not think a sheriff executing an arrest warrant is required by the Constitution to investigate every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent." As discussed at length below, in the post-arrest context, courts have repeatedly declined to imposed § 1983 liability on officers who fail to investigate claims of innocence while the officers are in possession of a facially valid warrant for the plaintiff. Plaintiff points to no evidence on the face of the warrant, or otherwise in Sikes' possession, that would have made it unreasonable for her to rely on the facially valid warrant she found in the file in responding

to the Chicago PD. Plaintiff also cites no authority or evidence to support their contention that a reasonable officer in Sikes' position would have known that it was not sufficient to rely on a facially valid warrant or that she was required to conduct additional investigation or send additional information to the arresting officers.

The Court also finds that Sikes is entitled to qualified immunity with regard to Plaintiff's assertion that Sikes violated his Fourth Amendment rights when she failed, upon receipt of the corrected version of the warrant, to cancel the Mistaken Warrant and any associated MULES entries. The uncontroverted facts show that either (1) the Clerk's Office staff did not discover and correct the error in the Mistaken Warrant until after Plaintiff was arrested, or (2) the Clerk's Office staff discovered and corrected the error in the Mistaken Warrant and delivered one or more "corrected" versions of the warrant to the Sheriff's Department before Plaintiff was arrested, but did not alert anyone in the Sheriff's Department that the corrected versions were intended to replace the Mistaken Warrant. Indeed, Plaintiff acknowledges in his brief in opposition to Sikes' motion for summary judgment that "[t]here is . . . no evidence that anyone in the Clerk's Office actually alerted anyone in the Sheriff's Department to the fact that there was a second warrant that was intended to correct the earlier mistake." Pl.'s Mem. Opp'n Mot. Summ. J. of Finch and Sikes, Doc. 99, at 8. Given that it is undisputed that no one alerted Sikes that the "corrected" warrant was an attempt to replace the earlier Mistaken Warrant, Sikes did not act unreasonably in not cancelling the Mistaken Warrant. Plaintiff cites no authority to support the suggestion that the Fourth Amendment or any other constitutional provision required Sikes, as a dispatcher, to personally and independently investigate every warrant she initialed as "received" to determine whether it had any relationship to any previously-submitted warrants, nor has the Court found any such authority.

*Cf. Mendoza*, 849 F.3d at 418-19 ("Simply laying blame or fault and pointing out what might have been done is insufficient to prove a constitutional violation.") (quotation marks omitted).

For all of the above reasons, the uncontroverted facts show that Sikes' conduct with regard to her receipt of the corrected warrant and her reliance on the Mistaken Warrant was objectively legally reasonable. Even viewing the evidence in the light most favorable to Plaintiff, the Court certainly cannot say that a reasonable official in Sikes position would have understood that her conduct was unlawful. Thus, Sikes is entitled to qualified immunity on the Fourth Amendment claim against her.

The Court next considers the possibility that Sikes' failure to investigate or to provide fingerprints to the Chicago PD unlawfully extended his detention and thus violated his due process rights under the Fourteenth Amendment. To the extent that Plaintiff is asserting such a claim, the Court finds that Sikes is entitled to qualified immunity, because the undisputed evidence shows Sikes did not violate Plaintiff's due process rights.

In *Baker v. McCollan*, 443 U.S. 137 (1979), the plaintiff was arrested pursuant to an arrest warrant that had been erroneously issued with his name and identifying information. *Id.* at 140-41. Despite Plaintiff's protestations of innocence, he was detained for three days before officials compared his appearance against a file photograph of the wanted man and, recognizing their error, released him. *Id.* at 141. Plaintiff sued the sheriff under § 1983 based on his failure to investigate and determine that the wrong man was imprisoned *Id.* at 142-44. Because the plaintiff did not challenge the wrong name being placed in the warrant or his initial arrest, the Court found that the Fourteenth Amendment's due process clause, not the Fourth Amendment, applied to the claim. *Id.* at 143-44. The Court acknowledged that a person could not be detained indefinitely in the face of repeated protests of innocence; however, it concluded that the detention of the plaintiff for three

days over a holiday weekend, pursuant to a facially valid arrest warrant, did not amount to a deprivation of liberty without due process of law. *Id.* at 144-45. The Court also noted that an official charged with maintaining custody was not "required by the Constitution to perform an error-free investigation" of a claim of innocence. *Id.* at 145-46. It concluded that Plaintiff's constitutional rights had not been violated and thus he had no claim cognizable under § 1983. *Id.* at 146.

In *Sanchez v. Swyden*, 139 F.3d 464 (5th Cir. 1998), Sanchez was detained by Customs at the Houston airport based on a warrant that had been issued for a person with his name, date of birth, and social security number, but which was actually for another individual. *Id.* at 465, 468. Employees of the Cheatham County Sherriff's Department received a request from a Customs agent asking for confirmation that a person named "Oscar F. Sanchez" was still wanted, responded that he was, and later sent additional identifying information, such as photographs and fingerprints. *Id.* at 465-66. At the probable cause hearing the next day, Plaintiff protested his innocence, the error was discovered, and he was released 26 hours after his initial detention. *Id.* at 466. Plaintiff sued several officials under § 1983, including the Sheriff's Department employees who had reported that he was still wanted, alleging that his constitutional rights were violated because the defendants were in possession of information that would have shown his innocence, yet they did not act on it for more than 24 hours. *Id.* at 464 & n.1, 468. Finding no meaningful distinction between the case before it and *Baker*, given that Sanchez was being held based on a facially valid arrest warrant, the court found that the actions of the defendants did not violate Plaintiff's right to due process. *Id.* at 468-69. The Court also noted that the defendants' failure to act on the exculpatory information in their possession constituted at most negligence, and more than mere negligence is required to support a wrongful detention claim under § 1983. *Id.* at 469. The court

noted that "a contrary conclusion would produce the anomalous result that the defendants were required to conduct a virtually error-free investigation." *Id.* at 469. *See also Brady v. Dill,* 187 F.3d 104, 112 (1st Cir. 1999) (finding qualified immunity protected officers who arrested and continued to detain the plaintiff based on a facially valid but erroneous warrant for his arrest despite his protestations of innocence; stating, "in a situation in which a warrant has issued upon probable cause, a police officer is not called upon either to exercise discretion or to weigh the proof. Rather, his obligation is more straightforward: to execute the warrant—which is, after all, a judicially-approved order—according to its tenor and terms, detaining the individual named therein. To place on police officers the additional burden of determining, after a legitimate arrest pursuant to a facially valid warrant, whether the person detained is or is not the guilty party would blur the usual separation of functions.").

Based on the above cases, it is clear that even if Sikes had been alerted to Plaintiff's claims of innocence, her failure to conduct additional investigation of those claims in the face of a facially valid warrant did not violate Plaintiff's constitutional rights. The sole case Plaintiff cites addressing detentions under the Fourteenth Amendment, *Rochell v. City of Springdale*, No. 5:16-CV-5093, 2017 WL 4817883 (W.D. Ark. Oct. 25, 2017), is inapplicable here. In *Rochell*, an officer who failed to conduct any investigation of an arrestee's innocence for three days even though the arrestee protested his innocence, the officer admitted to having doubts about whether he had the wrong person, and "[e]ven a cursory inspection of the ACIC report that [the officer] held in his hands would have revealed the felony criminal history that was listed there belonged to a *White* man named Johnny Wayne Russell, Jr.; whereas [the officer] had in his custody a *Black* man named Johnnie Rochell, Jr," *Id.* at *11. None of the factors present in *Rochell* is present here. Sikes was not aware of Plaintiff's protestations of innocence, Sikes has not admitted having any doubts about

whether Plaintiff was named in the warrant, and Sikes did not "hold in her hands" any information that would have revealed Plaintiff's innocence had she given it a "cursory inspection." Additionally, *Rochell* did not involve a facially valid arrest warrant.

For all of the above reasons, the record does not contain evidence from which a reasonable jury could find that Sikes' actions violated Plaintiff's rights to due process under the Fourth Amendment. Therefore, she is entitled to qualified immunity.

b.    § 1983 Claim Against Finch

The Court next considers Plaintiff's claim against Defendant Finch. Finch argues that he is entitled to summary judgment because the evidence shows that he had no personal involvement in the inputting of the warrant information into the MULES system or the specific events related to Plaintiff's arrest, detention, and subsequent release; because Finch cannot legally be held liable for the actions of his subordinates under a vicarious liability theory;[8] because there is no evidence that Finch failed to supervise or train his employees or that any such failure caused the alleged constitutional violations; because Plaintiff has not identified any Sheriff's Department policies or procedures that were unconstitutional or defective; and because no evidence exists that Finch knew of a pattern of unconstitutional acts and was deliberately indifferent to it. Finch also points out that the uncontroverted evidence in the record shows that when Sikes was hired a dispatcher at Wayne County, she did receive in-house training with another dispatcher, and she also went to MULES training with the Missouri State Highway Patrol. (Finch SOF, Doc. 93, ¶ 6).

---

[8] It is well established that "vicarious liability is inapplicable to . . . § 1983 suits," and that "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *See Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).

In his response, Plaintiff does not dispute Finch's contention that he was not personally involved in the specific events at issue here. Nor does Plaintiff argue that Finch is vicariously liable for the actions of his employees, failed to train or supervise his employees, or knew of a pattern of unconstitutional acts and was deliberately indifferent to it. Instead, Plaintiff argues that Finch's "liability—based on his personal conduct—derives from his position of authority as Sheriff of Wayne County and his personal failure to institute and implement constitutional policies in that position." Pl.'s Mem. Opp'n Mot. Summ. J. of Finch and Sikes, Doc. 99, at 11. Specifically, Plaintiff argues that (1) "Finch had established no policy preventing the use of DOR information not found on either the warrant or the associated probable cause statement in the entry of warrants into the MULES system—a system used for nationwide law enforcement—and Office practice allowed the entry of unverified information into that system"; (2) "[Finch] had established no policy requiring that information contained in a warrant be cross-checked for accuracy against the associated probable cause statement or the court file, despite the ease of doing so and the importance of the task" and "in fact, Office policy allowed the entry of unchecked information into the MULES system"; and (3) "[Finch] had established no policy requiring that other law enforcement agencies' or attorneys' requests for personal identifying information be provided when there was doubt expressed about a detainee's identity and wanted status, despite the easy accessibility of that information." *Id.* at 12. Plaintiff argues that if Finch had established such constitutionally appropriate policies, procedures, customs, and practices, Plaintiff would not have been unlawfully arrested upon his arrival in Chicago, or he would have been released immediately thereafter.

As a preliminary matter, the Court notes that it is not entirely clear whether Plaintiff is pursuing claims against Defendant Finch in his individual capacity or in his official capacity. In

the Second Amended Complaint, Plaintiff states that he is suing Defendant Finch in both his official and individual capacities, and Finch moves to dismiss the claim against him in its entirety. However, in his opposition to Finch's motion for summary judgment, Plaintiff relies solely on cases addressing individual liability under § 1983. Although it appears that Plaintiff is only pursuing claims against Finch in his individual capacity, the Court will address both possibilities.

i.   Individual capacity claims

In arguing that Finch is not entitled to summary judgment, Plaintiff relies on *Jackson v. Nixon*, 747 F.3d 537, 543-45 (8th Cir. 2014), an individual liability case in which the Eighth Circuit found that a "[e]ven if a supervisor is not involved in day-to-day operations, his personal involvement may be found if he is involved in 'creating, applying, or interpreting a policy' that gives rise to unconstitutional conditions." *Id.* at 543 (citing *Bonner v. Outlaw*, 552 F.3d 673, 679 (8th Cir. 2009)).

Plaintiff's arguments for holding Finch liable based on his failure to implement policies do not appear to fit well within the framework of *Jackson*, *Bonner*, and their progeny, which are directed toward an official's liability for his or her involvement in the creation or application of a concrete policy, rather than for a *failure* to create policies. *See Jackson*, 747 F.3d at 543-45 (holding that the plaintiff had stated a First Amendment § 1983 claim that against a department of corrections director for his personal involvement in a policy that unconstitutionally required inmates to attend a religious substance abuse treatment program); *Bonner*, 552 F.3d at 679 (defendant in a *Bivens* action was personally involved in "creating, applying, or interpreting a policy" that failed to comply with a Supreme Court case setting forth requirements for giving notice to inmates when correspondence directed toward them is rejected); *Harris v. Kemper*, No. 1:15-CV-140-SNLJ, 2018 WL 3008304, at *3 (E.D. Mo. June 15, 2018) (plaintiff stated a claim

under *Jackson v. Nixon* where he alleged that the defendants "implemented and enforced" a policy limiting plaintiff's mental health and medical appointments to 15 minutes); *Hazley v. Roy*, No. 16-CV-3935 (SRN/TNL), 2017 WL 9672390, at *9 (D. Minn. Nov. 3, 2017) (dismissing claim against supervisor where the plaintiff was "not alleging that his constitutional rights were violated as the result of any particular policy under [the defendant's] control"), *report and recommendation adopted*, No. 16-CV-3935 (SRN/TNL), 2018 WL 1399309 (D. Minn. Mar. 20, 2018); *Pittman v. Jesson*, No. 12-cv-1410 (SRN/TNL), 2014 WL 4954286, at *14 (D. Minn. Sept. 30, 2014) ("Pursuant to *Jackson v. Nixon*, a government official may only be held liable for a concrete policy decision that is unconstitutional").

Here, the only actual "policy" Plaintiff argues is defective is the policy permitting Sheriff's Department employees to enter information from an arrest warrant into the MULES system without independently verifying that the information in the warrant is consistent with the probable cause statement or other information in the court file. However, Plaintiff points to no authorities or evidence that might suggest such a policy "gives rise to unconstitutional conditions." Unlike the policy in *Jackson* requiring inmates to attend a religious program, the policy Plaintiff points to here does not, on its face, create an apparent violation of anyone's constitutional rights. As discussed at length above, courts generally find it reasonable for an officer to rely on a facially valid warrant without independently verifying it, and Plaintiff directs the Court to no authority supporting the proposition that a Sheriff's Department policy of relying on information in a facially valid warrant gives rise to unconstitutional conditions. Similarly, even assuming *arguendo* that Finch's failure to implement a policy to prevent the use of Department of Revenue information in MULES entries or his failure to implement a policy requiring dispatchers to send fingerprints to

agencies to would be actionable under *Jackson*, Plaintiff points to no evidence or authority to suggest that the failure to implement those policies gives rise to unconstitutional conditions.

Plaintiff's claims regarding Finch's failures to implement policies are conceptually more similar to allegations of failure to train than to allegations of policy creation or application. By arguing that Finch should have created policies, procedures, customs, and practices for his subordinates to follow in entering warrants into MULES and in responding to warrant verification requests, Plaintiff is essentially arguing that Finch should have provided better training and policies for training his subordinates. As Finch points out, however, such a claim requires evidence that Finch had notice of a pattern of unconstitutional acts and that his failure to train represents a deliberate indifference to those acts. In *Mendoza v. United States Immigration and Customs Enforcement*, 849 F.3d 408 (8th Cir. 2017), cited by Defendants, the Eighth Circuit considered a plaintiff's claim that a Sheriff was liable for failure to train employees adequately in handling ICE detainers, a failure that led to the wrongful detention of United States citizen under an ICE detainer. *Id.* at 419. After pointing out that there were training procedures on ICE detainers in place, the Eighth Circuit stated, "Even if there were no policies or training on how to handle ICE detainers, there must first be an obvious need for the training before a failure to have it will be considered a constitutional violation." *Id.* at 420. "When a supervising official who had no direct participation in an alleged constitutional violation is sued for failure to train or supervise the offending actor, the supervisor is entitled to qualified immunity unless plaintiff proves that the supervisor (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts." *Id.* (quoting *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015)). *See also Rogers v. King*, 885 F.3d 1118, 1122 (8th Cir. 2018) (to establish liability for failure to train, the plaintiff must show that the defendant "(1) received notice of a

pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts") (quotation marks omitted).

The Eighth Circuit granted summary judgment to the sheriff in *Mendoza*, because it found no evidence that the sheriff was on notice that ICE detainers were an issue that would have required additional training, and thus there had been no constitutional violation. *Mendoza*, 849 F.3d at 420. It further stated:

> Mendoza's real complaint is that the training and policies in place did not include certain steps relevant to Mendoza's particular situation that might have prevented this mistake. However, "[i]n virtually every instance where a person has [allegedly] had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." [*City of Canton, Ohio v. Harris*, 489 US. 378, 392 (1989)). Here, there was general training on ICE detainers but not specific training for this particular situation. Lack of particularized training that might have prevented Mendoza's three-day detention does not establish a constitutional violation.

*Id.*

Here, Plaintiff points to no evidence to suggest that Finch had a notice of a pattern of unconstitutional acts committed by his subordinates related to MULES entries or warrant inquiries, nor does Plaintiff point to any evidence that Finch tacitly authorized or was deliberately indifferent to those acts. Indeed, Plaintiff does not even respond to Finch's argument that there is no evidence of notice or deliberate indifference here. As in *Mendoza*, the absence of evidence that Finch was on notice of a pattern of unconstitutional acts by his subordinates, the lack of particularized training that might have prevented Plaintiff's overnight detention does not establish a constitutional violation.

For all of the above reasons, even viewing the facts in the light most favorable to Plaintiff, the Court finds that Finch did not violate Plaintiff's constitutional rights. Moreover, even assuming, *arguendo*, that the record might support a finding that Finch violated Plaintiff's

constitutional rights, the Court cannot say that those rights were clearly established, such that a reasonable officer in Finch's position would have known that he was violating them. Therefore, Finch is entitled to qualified immunity on the claims against him in his individual capacity.

ii.      Official Capacity Claims

Finally, the Court considers any possible claim that Plaintiff is bringing against Finch in his official capacity. "[A] suit against a public official in his official capacity is actually a suit against the entity for which the official is an agent." *Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010) (quoting *Elder-Keep v. Aksamit*, 460 F.3d 979, 986 (8th Cir. 2006)). "[A] municipality [or county] can be found liable under § 1983 only where the municipality [or county] *itself* causes the constitutional violation at issue." *Brewington v. Keener*, 902 F.3d 796, 801 (8th Cir. 2018) (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)). "Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an 'official municipal policy,' (2) an unofficial 'custom,' or (3) a deliberately indifferent failure to train or supervise." *Mick v. Raines*, 883 F.3d 1075, 1079 (8th Cir. 2018) (quoting *Corwin v. City of Independence*, 829 F.3d 695, 699 (8th Cir. 2016)).

The nature of Plaintiff's official-capacity claim (to the extent he asserts one) is not clear. To the extent that Plaintiff's claim is that Wayne County is liable base on an unconstitutional policy, the only "policy" Plaintiff identifies as flawed—permitting the Sheriff's Department to enter information from a facially valid warrant into MULES—does not appear on its face to be unconstitutional or to be likely to lead to violations of constitutional rights. To the extent that Plaintiff's claim is based on Wayne County's failure to implement particular policies, Wayne County is entitled to summary judgment because, as with Defendant Finch, the record does not contain evidence that Wayne County had notice of a pattern of unconstitutional acts or was

deliberately indifferent to those acts. "[A] municipality may not be held liable under § 1983 merely because it 'failed to implement a policy that would have prevented an unconstitutional act by an employee otherwise left to his own discretion.'" *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1216 (8th Cir. 2013) (quoting *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 395 (8th Cir. 2007)). Instead, liability in such cases only exists if the municipality's failure shows "deliberate indifference to the constitutional rights of the citizenry." *Szabla*, 486 F.3d at 393. "Notice is the touchstone of deliberate indifference in the context of § 1983 liability." *Atkinson*, 709 F.3d at 1216 (affirming grant of summary judgment based on the absence of written policies on the use of force; finding no deliberate indifference where "[o]ther than the single incident at issue in this case, Atkinson has submitted no evidence of excessive force by Sanders or any other city police officer"). *See also Szabla*, 486 F.3d at 392-93 (affirming grant of summary judgment based on the absence of a policy on the use of canines; finding no deliberate indifference where [t]he evidence d[id] not show that [the city] had a history of police officers unreasonably using canines to apprehend suspects without advance warning, such that the need for additional training or supervision was plain"; noting that one "isolated incident" could not support a finding of deliberate indifference).

The lack of evidence of deliberate indifference also establishes that Wayne County is not liable based on its unofficial customs or failure to train or supervise. *See Mendoza*, 849 F.3d at 420 (granting summary judgment on claim against the County where there was no evidence that it was on notice of an issue with ICE detainers or a need for additional training with regard to ICE detainers); *Johnson v. Douglas Cty. Med. Dep't*, 725 F.3d 825, 828 (8th Cir. 2013) (municipal liability under § 1983 for an unofficial custom requires "1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's

employees; 2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and 3) That plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation.").

For all of the above reasons, Defendants have established that Plaintiff does not have evidence from which a reasonable jury could find in his favor in an official-capacity claim against Defendant Finch, and thus Finch is entitled to summary judgment on that claim.

### B. Plaintiff's State Law Claims (Counts II, III, IV, VI, VII, and VIII)

Because the Court is dismissing all of the federal claims in this lawsuit, the Court next considers whether to exercise supplemental jurisdiction over the remaining state law claims. A district court may decline to exercise supplemental jurisdiction over state claims if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary." *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 359 (8th Cir. 2011) (quoting *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009)). However, the Eighth Circuit has stated that "[i]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Barstad v. Murray Cty.*, 420 F.3d 880, 888 (8th Cir. 2005) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). This reflects the policy that the federal courts should "exercise judicial restraint and avoid state law issues whenever possible" and should "provide great deference and comity to state court forums

to decide issues involving state law questions." *Condor Corp. v. City of St. Paul*, 912 F.2d 215, 220 (8th Cir. 1990). *See also Gregoire v. Class*, 236 F.3d 413, 419-20 (8th Cir. 2000) ("When state and federal claims are joined and all federal claims are dismissed on a motion for summary judgment, the state claims are ordinarily dismissed without prejudice to avoid needless decisions of state law . . . as a matter of comity.") (quotation marks omitted).

Here, after consideration of the relevant factors, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims, which involve numerous significant questions of state law that would be better determined by the Missouri state courts. Accordingly, Plaintiff's state law claims (Counts II, III, IV, VI, VII, and VIII) will be dismissed without prejudice. To the extent that the motions for summary judgment are directed toward the state law claims, they are denied as moot.

### IV.    CONCLUSION

For the reasons stated above,

**IT IS HEREBY ORDERED** that the Motion for Summary Judgment filed by Defendant Darren Garrison and Laura Yount (Doc. 94) is **GRANTED IN PART and DENIED IN PART**. The motion is **GRANTED** as to Plaintiff's claims under 42 U.S.C. § 1983 (Count V) and **DENIED** as moot as to Plaintiff's claims under state law (Counts VI, VII, and VIII).

**IT IS FURTHER ORDERED** that the Motion for Partial Summary Judgment filed by Defendants Dean Finch and Stacy Sikes (Doc. 91) is **GRANTED IN PART and DENIED IN PART**. The motion is **GRANTED** as to Plaintiff's claims under 42 U.S.C. § 1983 (Count I) and **DENIED** as moot as to Plaintiff's claims under state law (Counts III and IV).

**IT IS FURTHER ORDERED** that Plaintiff's claims under 42 U.S.C. § 1983 (Counts I and V) are **DISMISSED**, with prejudice.

**IT IS FURTHER ORDERED** that Plaintiff's claims under state law (Counts II, III, IV, VI, VII, and VIII) are **DISMISSED**, without prejudice.

SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 18th day of December, 2018.